IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-00086-RPM-MJW

CCC Group, Inc.,
a Texas Corporation,

                Plaintiff,

v.

Martin Engineering Company,
an Illinois Corporation,

                Defendant.

---

MEMORANDUM OPINION AND ORDER FOR
ENTRY OF JUDGMENT FOR DEFENDANT

---

Plaintiff CCC Group, Inc. brought this action claiming infringement of United States Patent No. 6,000,533 ("the '533 Patent"), United States Patent No. 6,176,368 ("the '368 Patent"), and United States Patent No. 6,135,171 ("the '171 Patent"). The three patents relate to methods and apparatus for controlling dust emissions in bulk material handling operations.

Bulk material handling systems move bulk material, such as coal, in mining and other industrial operations. Dust emissions generated by the movement of bulk material create health and environmental hazards. Accordingly, dust control is of great importance to industry.

The applications for the patents-in-suit were filed by participants in a project at the Powder River Coal Company's Rochelle plant near Gillette, Wyoming in 1997 and 1998. The '533 Patent, entitled Passive Dust Control System, issued to Garren Tooker and Steven Bradbury on December 14, 1999. The '171 Patent, entitled Passive Enclosure Dust Control System, issued

to L. Alan Weakly and Delmer Shelstad on October 24, 2000. The '368 Patent, entitled Passive Dust Control Circulation Compartment Having Secondary Dust Control Features, issued to Tooker and Bradbury on January 23, 2001. The '533 and '368 Patents were assigned to Air Control Science, Inc. CCC Group, Inc. acquired the '533 and '368 Patents through its acquisition of Air Control Science, Inc. in February 2007. The plaintiff has licensed the '171 Patent from Weakly, who is now the sole owner of the '171 Patent.

Defendant Martin Engineering Company ("Martin") designs, manufactures and sells apparatus for controlling dust in bulk material handling operations. The plaintiff claimed that numerous dust control systems installed at various coal-fired power plants infringed the '533 and '368 Patents and, as to approximately forty installations, the plaintiff claimed infringement of all three patents. Martin designed the accused systems, manufactured or sold some components of them, and provided services with respect to installation and maintenance.

Martin denied infringement and challenged the validity of the asserted patent claims on grounds of anticipation, obviousness, indefiniteness, lack of enablement, failure to disclose the best mode, improper inventorship and derivation, and inequitable conduct.

At the close of the plaintiff's case-in-chief, Martin moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). The court granted that motion with respect to the '533 and '368 Patents, finding them invalid from the plaintiff's evidence. The court dismissed the plaintiff's state law claims of interference with prospective business advantage and unfair competition for lack of evidence. Martin's Rule 50 motion was denied as to the claims of the '171 Patent. After all the evidence was presented, Martin again moved for judgment as a matter of law. That motion was denied. The issues of infringement and invalidity of the '171 Patent were submitted

to the jury, except that the court dismissed Martin's on-sale bar defense and reserved Martin's defense of inequitable conduct and issues of prosecution history estoppel for later determination by the court, if necessary, after the jury returned its verdict.

On March 21, 2008, the jury returned a verdict in favor of the plaintiff. The jury found sixteen asserted claims of the '171 Patent infringed by twenty-eight installations of Martin dust control systems and denied infringement at nine installations. The jury rejected Martin's invalidity defenses and found that the infringement was willful. The jury awarded damages in the amount of $1,679,616.00, as a reasonable royalty.

On April 4, 2008, Martin filed a combined motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law, or in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59(a).

Upon review of the plaintiff's evidence and the post-verdict briefing, the court now finds and concludes that plaintiff failed to prove infringement. Accordingly the verdict is set aside and the defendant is entitled to judgment of dismissal as a matter of law. The court accepts the jury's verdict that Martin did not prove invalidity of the '171 Patent by clear and convincing evidence.

The court may enter judgment as a matter of law "[i]f during a jury trial a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Davis v. U. S. Postal Serv*., 142 F.3d 1334, 1339 (10th Cir. 1998). In reviewing the record, the court may not weigh evidence, judge witness credibility, or substitute its factual conclusions for those of the jury. *Johnson v. Unified Gov't of Wyandotte County/Kan. City, Kan.,* 371 F.3d 723, 728 (10th Cir. 2004); *Brown v. Gray,* 227 F.3d 1278,

1285 (10th Cir. 2000).  The evidence, and any inferences drawn therefrom, must be viewed in favor of the non-moving party.  *Johnson,* 371 F.3d at 728; *Snyder v. City of Moab*, 354 F.3d 1179, 1184 (10th Cir. 2003).

The plaintiff claimed that Martin directly infringed the '171 Patent.  Alternatively, CCC Group claimed that Martin's customers' use of the accused systems constituted infringement which Martin contributed to or induced.  Proof of either claim of indirect infringement requires proof that there has been direct infringement of the patent-in-suit.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).

To establish infringement, CCC Group had to prove by a preponderance of the evidence that each element and limitation of at least one of the Patent's claims is present in the accused system, either literally or under the doctrine of equivalents.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).  Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, exactly as those limitations are defined in the claim.  *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1334 (Fed. Cir. 2001).  Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner-Jenkinso*n, 520 U.S. at 21 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)).  Equivalence  may be shown by the function-way-result or "triple identity" test.  *Warner-Jenkinson Co.*, 520 U.S. at 39-40.  That test focuses on the function served by a particular claim element, the way that element serves that function, and the result obtained by that element.  *Id.*  Another test for equivalence, known as the

insubstantial differences test, also focuses on the distinctions between the claimed element and the asserted equivalent. Under that test, "[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004). Equivalence must be evaluated with respect to individual elements and limitations of the claim, not the invention as a whole. *Warner-Jenkinson Co.*, 520 U.S. at 29.

The plaintiff claimed infringement of claims 1, 2, 4, 5, 6, 9, 15, 16, 18, 19, 21, 22, 23, 24, 25, and 26 of the '171 Patent. All are apparatus claims and all describe a material transfer system for moving bulk material from a first location to a second location. Claims 1, 9 and 21 are the independent claims of the patent.

Claim 1 reads as follows:

1. A material transfer system for controlling dust emissions generated during a transfer operation for bulk material when material is being moved from a first location to a second location and wherein the first and second locations are spaced from each other, the system comprising,

a conveyor system having at least one end portion associated with the first location for moving bulk material which generates fugitive dust emissions to the second location;

a chute member having opposed end portions and being positioned between the first and second locations for receiving the material from the one end portion of the said conveyor system and delivering the material to the second location, one end portion of said chute member being positioned adjacent the first location and the opposed end portion of said chute member being positioned adjacent to the second location, said chute member being configured to eliminate direct impact of the material at the second location;

a deflector member spaced from said chute member and positioned in the area adjacent the one end portion of said conveyor system, said deflector member being shaped and dimensioned so as to direct the material from one end portion of said conveyor system onto said chute member; and

an enclosure member enclosing at least the one end portion of said conveyor system, said chute member, and said deflector member, said enclosure member being further positioned at least adjacent to the second location and having sufficient volume to allow for recirculation of the induced air flow associated with the moving material as such material is moved from said conveyor system to the second location, said enclosure member including increased volume in the area adjacent to said chute member, said deflector member, and in the vicinity where the material is delivered to the second location wherein fugitive dust emissions generated during the transfer of bulk material between the first and second location are substantially contained within the enclosure member.

(Col. 14, l. 38-Col. 15, l. 11). The asserted claims that depend on claim 1 describe an adjustable feature of the deflector member (claim 2), a stilling zone included within an enclosure member that extends over a portion of the second location (claim 4), and the number and position of curtains associated with the stilling zone (claims 5 and 6).

Claim 9 describes a system having first and second conveyor systems associated with the first and second locations. Claim 9 reads as follows:

9. A material transfer system for controlling dust emissions generated during a transfer operation when material is being moved from a first location to a second location, the system comprising:

a first conveyor system having at least one end portion associated with the first location for moving the material to the second location

a second conveyor system having at least a portion thereof associated with the second location for receiving the material from said first conveyor system, said first conveyor system being spaced from said second conveyor system

a chute member having opposed end portions positioned between said first and second conveyor systems for receiving the material from said first conveyor system and delivering such material to said second conveyor system, one end portion of said chute member being positioned adjacent the one end portion of said first conveyor system and the opposite end portion of said chute member being positioned adjacent a portion of said second conveyor system, said chute member being configured to eliminate direct impact of the material unto [sic] said second conveyor system and constructed so as to position the opposite end portion thereof at an acute angle with respect to the direction of movement of said second conveyor system so as to

substantially align a trajectory of the moving material at the second location with the direction of movement of said second conveyor system;

a deflector member spaced from said chute member and positioned in the area adjacent the one end portion of a said first conveyor system, said deflector member being constructed to direct the material onto said chute member;

an enclosure member enclosing at least the one end portion of said first conveyor system, said chute member, said deflector member, and at least a portion of said second conveyor system, said enclosure having sufficient volume to allow for recirculation of the induced air flow associated with the material as such material is moved from the first conveyor system to the second conveyor system; and

a stilling zone formed within said enclosure downstream from the location where the material is received onto said second conveyor system, said stilling zone extending over at least a portion of said second conveyor system and having means associated therewith for impeding any dust laden air flow through said zone.

(Col. 15, l. 44 – Col. 16, l. 25). The claims that depend on claim 9 further describe an adjustable feature of the deflector member (claim 15), the volume of the enclosure member (claim 16), and the number and position of curtains associated with the stilling zone (claims 18 and 19).

Claim 21 has a conveyor system associated with the second location. Claim 21 reads as follows:

21. A material transfer system for controlling dust emissions generated during transfer operation when material is being moved from a first location to a second location, the first and second locations being spaced from each other, the system comprising:

a conveyor system having at least a portion thereof associated with the second location for receiving the material from the first location;

a chute member having opposed end portions positioned between the first and second locations for receiving the material from the first location and delivering the material to the conveyor system associated with the second location, a first end portion of said chute member being positioned adjacent the first location and a second end portion of said chute member being positioned adjacent a portion of said conveyor system, said chute member being cradle-like in shape and having one end portion thereof positioned such that the trajectory of the material leaving said chute member forms

an acute angle with the direction of movement of said conveyor system so as to eliminate direct impact of the material unto said conveyor system;

a deflector member positioned in the area adjacent the first location, said deflector member being constructed to direct the material onto said chute member;

an enclosure positioned adjacent the first location and enclosing said chute member, said deflector member, and at least a portion of said conveyor system, said enclosure having sufficient volume to allow for recirculation of induced air flow associated with the material as the material is moved from the first location to said conveyor system; and

a stilling zone formed within said enclosure downstream from the location where the material is received onto said conveyor system, said stilling zone extending over at least a portion of said conveyor system and having means associated therewith for impeding any dust laden air flow through said zone.

(Col. 17, l. 8-Col. 18, l. 9). The claims that depend on claim 21 further describe the construction and orientation of the chute member (claims 22 and 23), an adjustable feature of the deflector member (claim 24), and the number and position of dust curtains associated with the stilling zone (claims 25 and 26).

Martin argues that the plaintiff failed to present evidence showing that each accused system has a "chute member" that is the same as the chute member defined by the claims-in-suit. Martin also argues that prosecution history estoppel precludes the plaintiff from relying on the doctrine of equivalents to show that an equivalent structure is present in the accused systems.

There was a claim construction dispute regarding the term "chute member." That dispute focused on whether the chute member must be separate and apart from the walls of the enclosure member. Martin proposed the following construction:

A "chute member" is a structure within the containment housing, separate and apart from the enclosure walls, having a first end adjacent to the first location and a second end adjacent to the second location. The chute member must eliminate direct impact of the material at the second location.

The plaintiff proposed that chute member be construed to mean "an inclined structure." The Court construed the term chute member to mean "an inclined structure within the containment housing" and so instructed the jury.

Apart from the dispute about whether the chute member must be separate and apart from the enclosure member, it is undisputed that the three independent claims of the '171 Patent include the following limitations with respect to the structure of the chute member: The chute member must have opposed end portions and be positioned between the first and second locations. The chute member must receive the material from the first location and deliver the material to the second location. The chute member must have one end portion positioned adjacent the first location and an opposite end portion positioned adjacent the second location. The chute member must be configured to eliminate direct impact of the material at the second location. Claims 9 and 21 include the additional requirement that the chute member be constructed so as to position the opposite end portion at an acute angle with respect to the direction of movement of the second conveyor system. There are some variations in the relevant language of each independent claim. For example, claims 1 and 21 require that the chute member be positioned "between the first and second locations," whereas claim 9 uses the words "between said first and second conveyor systems." Claims 1 and 21 require that the chute member have one end positioned "adjacent the first location," whereas claim 9 requires that the chute member have one end positioned "adjacent the first conveyor system." Regardless of these minor variations in wording, the same basic limitations are present in each independent claim.

In 2002, Martin obtained a one-year limited, nonexclusive sublicense for the '171 Patent from Dust Control, Inc., which had obtained patent rights by assignment from the inventors of

the '171 Patent. During the license period, Martin marketed dust control technology under the tradename PECS.[1] Disputes arose between Martin and DCI and the license was not renewed. Shortly after the license expired, Martin began advertising and selling dust control technology under the tradename Inertial Flow Transfer ("IFT") system. The accused systems were installed after the expiration of Martin's sublicense.

Each installation was custom designed to meet the user's requirements. The components in each installation vary with respect to configuration, shape and size, depending on the requirements and constraints of each transfer point within a particular design. Factors affecting the design of systems for controlling dust emissions at transfer points include the type of bulk material being transported, the characteristics of that material (i.e., particle size, moisture content, and other variables), conveyor belt width and speed, the relative positions of the loading point and receiving point, the transition length, and other factors unique to the environment of each installation.

The plaintiff's infringement analysis was given by Professor Jonathon W. Naughton, a witness with expertise in fluid mechanics, fluid dynamics, and mechanical engineering. Professor Naughton does not have special knowledge, training or experience in bulk material handling operations. Professor Naughton based his testimony and expressed his opinions upon his review of Martin's engineering drawings and specifications for the accused installations. He did not do any field inspections.

---

[1]The '171 Patent is entitled Passive Enclosure Dust Control System. PECS is an acronym for Passive Enclosure Control System.

Referring to a demonstrative exhibit depicting a schematic of the Florida Power, Crystal River CV1 to CV2 transfer point ("the Progress Energy demonstrative"), Professor Naughton described in general terms the elements of the asserted independent and dependent claims of all three patents (the '533, '368, and '171). (Tr. at Mar. 12, 2008, 57:24 – 76:15). He testified that when comparing the design drawings of the accused systems to the '171 Patent, he looked generally for four features, which he described as (1) an "enclosure;" (2) a "hood" or "deflector member;" (3) a "spoon" or "chute member," and (4) a "stilling chamber." (Tr. Mar. 12, 2008, at 61:8-24; 63:2-22, and 110:16-23).

Professor Naughton analyzed the air flows within Martin's systems, using computer modeling and Computational Fluid Dynamics. He opined that the structure of each accused system has an enclosure that allows air to recirculate within that space. (Tr. Mar. 13, 2008, 27:7-69:11). This testimony addressed the "enclosure member" of the '171 Patent claims and the limitation requiring that the enclosure member have sufficient volume to allow for recirculation of the induced air flow associated with the moving material. This element of each claim is present in each of the accused systems.

Professor Naughton used the terms "spoon" and "chute member" interchangeably, stating that they refer to a structure that "cleanly picks up the coal as it falls and delivers it to the second conveyor." (Tr. March 12, 2008, at 61:18-20). Professor Naughton stated that the spoon or chute member directs the falling material into alignment with the second location and serves to eliminate direct impact of the material on the second conveyor. (*Id.* at 70:12-19). The term "spoon" does not appear in the '171 Patent claims or the specification. The evidence at trial showed that "hood" and "spoon" are terms that were used in the field of bulk material handling

with respect to concepts and products that were known in the art before the inventors conceived the invention of '171 Patent. *See* P. Sundstrom & C.W. Benjamin, *Innovations In Chute Design*, published by the Institution of Engineers, 1993 Conference on Bulk Materials Handling (Ex. H-6 at 191-193); Gulf Conveyor brochure, dated August 30, 1996 (Ex. C-88).

Professor Naughton grouped the accused installations into two general categories: (1) conveyor-to-conveyor systems, which he classified as Type 1 systems, and (2) "something-to-conveyor" systems, which he classified as Type 2 systems. (Tr. Mar. 12, 2008, at 58:4-25). Of the systems that Professor Naughton included in his Type 1 category, some were systems which the plaintiff claimed infringed the '533 and '368 Patents, and some were systems which the plaintiff claimed infringed all three patents. The systems which Professor Naughton included in the Type 2 category were ones which the plaintiff claimed infringed the '533 and '368 Patents.

Professor Naughton classified the Type 1 systems into five sub-groups, based on a comparison of the length of a component he identified as an "intermediate chute" to the overall height of the transfer point. (Tr. Mar. 12, 2008 at 80:4 – 81:25). Professor Naughton testified that, according to his classification system, Type 1A systems have a "short intermediate chute" between the first location and the spoon. (Tr. Mar. 12, 2008, at 82:20-83:3). The Type 1B systems have an "almost a nonexistent intermediate chute" between the first location and the spoon. (*Id.* at 112:4-5). The Type 1C systems have a "longer intermediate chute" between the first location and the spoon. (*Id.* at 121:14-25). The Type 1D systems have a "very long intermediate chute." (*Id.* at 133:21-25). The fifth category was a "catch-all" category for accused systems which did not fall into the other four categories. (*Id.* at 81:20-23). These

categories are Professor Naughton's own nomenclature. The plaintiff does not contend that the Type 1 and Type 2 categories or the Type 1A-D subcategories are generally recognized in the art of bulk material handling.

Professor Naughton testified that he identified "elements of the '171 Patent" in various accused installations, based on his review of the Martin engineering drawings and specifications for those systems. (Tr. Mar. 12, 2008, at 95:2 – 143:1; Tr. Mar. 13, 2008, at 4:7 – 12:11). Professor Naughton did not identify which of the asserted '171 Patent claims were infringed by particular installations he identified as having elements of that Patent. Professor Naughton did not testify that the component identified as the spoon of each accused systems has opposed ends, with one end positioned adjacent the first location and an opposed end positioned adjacent the second location. He did not describe the lengths of the intermediate chutes that separate the spoon of each accused system from the first location of that system. He did not address the meaning of adjacent or relate his classification system to the limitations of the '171 claims.

Proof of infringement requires that each element and limitation of an asserted patent claim or claims be compared to an accused system. It was undisputed that the accused installations are not identical with respect to the configuration and size of their components. To prove infringement, the plaintiff must identify the presence of each element and limitation of an asserted patent claim with respect to each accused installation. Professor Naughton did not provide that detailed analysis. Instead, he summarized the '171 Patent claims as having four general features. He oversimplified the elements and limitations of the claims, particularly with respect to the chute member. He testified that some of four general features of the '171 Patent claims are present in each accused system, but he did not identify each element and limitation of

-13-

an asserted claim in each accused system. Professor Naughton's testimony did not satisfy the plaintiff's burden of proof of infringement.

The Martin engineering drawings and specifications in evidence do not show that in each accused system the component that Professor Naughton identified as a spoon is positioned with one end adjacent to the first location. On the contrary, the Martin drawings show, and as Professor Naughton testified, in the accused systems, a component called a spoon is located downstream from the first location and separated from it by an intermediate chute or chutes.

Todd Swinderman testified during cross-examination that the spoon component of Martin's IFT systems extends into the skirted area and delivers the bulk material to the receiving belt. (Tr. Mar. 17, 2008, at 58:24– 60:25). That evidence is sufficient to show that the accused systems have an inclined structure that is at least partially within the enclosure and which is configured to eliminate direct impact of the material at the second location. But there is no evidence that the spoon component of the accused systems has opposed end portions, with one end portion positioned adjacent the first location and the opposed end portion positioned adjacent the second location. Thus, the Martin engineering drawings do not show that the "spoon" of each accused system is exactly the same as the "chute member" of the '171 Patent claims – that is, that it literally meets all the limitations that define a chute member.

The plaintiff's presentation of this case emphasized the similarity between Martin's marketing materials for technology Martin marketed under the tradename PECS when it had a license for the '171 Patent and nearly identical marketing materials for technology Martin marketed under the tradename Inertial Flow Transfer ("IFT") after the license expired. The plaintiff apparently persuaded the jury that Martin's continued use of the same marketing

materials created an inference that Martin recognized that it was continuing to practice the claims of the Patent without paying for permission. That argument has appeal but it does not satisfy the requirements of infringement analysis. The marketing materials describe general features and concepts of the transfer technology offered by Martin and include simplified drawings illustrating those general features. The materials depict Martin's PECS and IFT systems as having a hood, a spoon and a stilling zone. The use of the term "spoon" in those materials does not show that each accused system has a chute member as defined in the '171 Patent. Infringement is determined by comparing an accused product with the claims-in-suit, not by comparing the accused product to another commercial product or marketing materials. That rule is especially important in this case because the numerous accused systems are custom designed. Comparisons of generic drawings from Martin's marketing materials for the periods during and after the license period do not satisfy the plaintiff's burden.

The plaintiff contends that Martin witnesses Terry Vandemore, Greg Bierie and Todd Swinderman admitted that the Martin systems contain every element of the '171 Patent claims. The plaintiff mischaracterizes the testimony of those witnesses. Vandemore stated that Martin's IFT systems include a hood, a spoon and an enclosure. (Tr. Mar. 17, 2008, at 136:14-17). Bierie stated that the PEC system sold during the license period had a hood, a spoon, an enclosure with volume to handle the induced air flow within the system, and recirculation. (Tr. Mar. 11, 2008, at 25:4-9). Bierie also agreed that Martin's marketing materials for its IFT technology showed a hood, a spoon, recirculation, and stilling zones. (Tr. March 11, 2008, at 125:22-126:19). As explained above, the general feature called a "spoon" does not meet the definition of a "chute member" in the '171 Patent claims. Swinderman testified that the accused systems have some of

the elements of the '171 Patent, but he did not admit that the accused systems have a chute member as defined by the claims. (Tr. Mar. 14, 2008, at 182:15-8).

The plaintiff argues that even if the record does not support a finding of literal infringement, the evidence was sufficient to show infringement under the doctrine of equivalents. The plaintiff's equivalence theory was not clearly articulated at trial. The plaintiff did not present particularized evidence of equivalence.

In its post-trial brief, the plaintiff argues that the claim limitation requiring that the chute member have one end positioned adjacent the first location may be disregarded for the purpose of equivalence analysis. The plaintiff asserts that the proximity of the inclined structure to the first location is immaterial, and that a system having an inclined structure located between the first and second locations satisfies the chute member element, so long as the inclined structure serves to eliminate the direct impact of the moving material at the second location. This argument is unavailing because it would recapture claim scope that the applicants (Weakly and Shelstad) surrendered during prosecution.

"The doctrine of prosecution history estoppel limits the doctrine of equivalents when an applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to an examiner." *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (quoting *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005)). Questions related to the application and scope of prosecution history estoppel are matters to be determined by the court. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003). No jury instruction was given regarding prosecution history estoppel.

The application for the patent that became the '171 Patent was filed on March 18, 1999.[2] In an Office Action dated February 10, 2000, the Examiner rejected application claims 1-30 for stated reasons, including indefiniteness, anticipation, and obviousness. The Examiner rejected certain claims, including the independent claims, as anticipated by U.S. Patent 5,553,968 to Campbell ("Campbell"). The Examiner also cited U.S. Patent No. 3,731,397 to Kayatz ("Kayatz") and U.S. Patent 3,305,128 to Dearsley ("Dearsley") as references that anticipated some of the application claims. The Examiner rejected certain application claims as obvious in light of the '533 Patent to Bradbury, in combination with other references, including U.S. Patent No. 1,803,689 to Bernadt.

The applicants responded on May 8, 2000, submitting amendments and arguing that their claims as amended were distinct from the references cited by the Examiner. The amendments related to the position, configuration and function of the chute member. Claim 1 was amended to add the following language: "one end portion of said chute member being positioned adjacent the first location and the opposed end portion of said chute member being positioned adjacent the second location, said chute member being configured to eliminate direct impact of the material at the second location." Similar amendments were made to the application claims that became independent claims 9 and 21.

---

[2]Relevant portions of the file wrapper for the '171 Patent are included in Trial Exhibit 40. The complete file wrapper for the '171 Patent was submitted on February 22, 2008, as part of the defendant's supplemental appendix concerning information relevant to claim construction. [Doc. 238].

The Examiner had identified element 80a in Campbell as corresponding to the chute member of the application claims. Among other arguments, the applicants distinguished their claims from Campbell, stating:

> In fact, the wall 80a of Campbell does not comprise a chute member similar to chute 26 of the present invention, but instead, wall 80a merely forms a portion of the enclosure 67 formed by walls 80a and 80b. Wall 80a in Campbell is comparable to the back wall of enclosure 20 behind chute 26 as illustrated in Fig. 1 of the present application. Chute 26 of Applicants is separate and apart from the enclosure walls.

The applicants also stated:

> In addition, Applicants have further amended the three independent claims 1, 9 and 22 regarding the position, configuration and performance of the chute member as taught in the present invention so as to even further distinguish the present claims over the Campbell reference.

With respect to the Examiner's rejection over U.S. Patent 3,305,128 to Dearsley, the applicants stated:

> Still further, the chute 36 and deflector 38 identified in the Dearsley reference are not comparable to the chute 26 and deflector 28 disclosed in the present application. The members 36 and 38 of Dearsley form the walls of the enclosure and a separate chute and deflector member as defined in the present claims and as illustrated in Fig. 1 do not exist in the Dearsley reference.

With respect to the rejection over the '533 patent, the applicants argued that the invention of the '533 Patent had no chute member as defined by the application claims, stating:

> Applicants first note that the Bradbury et al construction does not disclose a chute member as described and claimed in the present invention. … The chute member referred to by the Examiner as a chute is merely one of the side walls associated with enclosure 200 and, importantly, the material never touches wall 263 and, still further, wall 263 is not configured so as to eliminate direct impact of the material at the second location. These are limitations set forth in all of the independent claims of this application.
>
> In total contrast, the present invention discloses a chute 26 which is separate and apart from the enclosure or housing walls and which chute member is specifically configured and constructed so as to eliminate direct impact of the

> material onto the second location. This is not true in any of the systems disclosed in the Bradbury patent. ... Here again, no such disclosure is found in the Bradbury reference, and, importantly, <u>no separate chute member</u> is provided in any of the embodiments disclosed in the Bradbury reference.

(Ex. 40) (emphasis in original).  With respect to the Bernadt reference, U.S. Patent No. 1,803,689, the applicants stated that it does not include "an enclosure enclosing … the chute member and the deflector member as required by all of the pending claims."

Twenty-nine of the thirty application claims were ultimately allowed, after some additional amendments.

A narrowing amendment made to satisfy any requirement of the Patent Act gives rise to a presumption that the patentee surrendered the territory between the original claim and the amended claim.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 740 (2002).  The first question is "whether an amendment filed in the [PTO] has narrowed the literal scope of a claim."  *Festo*, 344 F.3d at 1366 (citing *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003)).  There is no dispute that the amendments in question narrowed the claim scope.

"[I]f . . . the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability."  *Festo*, 344 F.3d at 1366.  Again, there is no dispute that the amendments in question related to patentability.

"[T]he third question . . . addresses the scope of the subject matter surrendered by the narrowing amendment."  *Festo*, 344 F.3d at 1367.  There is a presumption that the patentee surrendered all territory between the original claim limitation and the amended claim limitation. *Festo*, 535 U.S. at 740.  The patentee may overcome the presumption by showing that "at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a

claim that would have literally encompassed the alleged equivalent." *Id.* at 741. The patentee may do so:

> by demonstrating that "the equivalent [would] have been unforeseeable at the time of the [amendment]," that "the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question," or that "there [was] some other reason suggesting that the patentee could not reasonably expected to have described the insubstantial substitute in question."

*Festo*, 344 F.3d at 1365 (quoting *Festo*, 535 U.S. at 740-41). If the patentee fails to rebut the presumption, "then prosecution history estoppel bars the patentee from relying on the doctrine of equivalents for the accused element." *Festo*, 344 F.3d at 1367.

The plaintiff attempts to rebut the presumption, arguing that the rationale of the narrowing amendments was to clarify that the chute member serves to eliminate direct impact of the material at the second location, and the adjacency of the chute member to the first location bears no more than a tangential relationship to that rationale.

This argument fails. The narrowing amendments addressed the position and configuration of the chute member, not merely its purpose. The amendments supplemented the applicants' arguments about the distinctions between the chute member of their invention and chutes shown in prior art. It is irrelevant whether patentable claims might have been written without including all of the limitations that were added to narrow the original application claims. The applicants amended the claim to describe a chute member having one end portion located adjacent the first location. The plaintiff cannot now argue that this limitation should be ignored as unnecessary. "The doctrine of equivalents is not a license to ignore claim limitations." *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 398 (Fed. Cir. 1994).

The applicants' arguments to the Examiner, explaining the distinctive characteristics of the chute member, are also supportive of the defendant's argument on claim construction that the chute member must be separate and apart from the enclosure walls. While that argument was then rejected and the jury was instructed that chute member means "an inclined structure within the containment housing," an alternative basis for vacating the verdict is that this element of claim construction should have been limited to a structure within the containment housing, separate and apart from the enclosure walls, having a first end adjacent to the first location and a second end adjacent to the second location. That construction would have defeated infringement.

The plaintiff's post-trial brief asserts that the combination of the spoon component and the intermediate chute or chutes of each accused system constitutes an equivalent of the claimed chute member. (Pl.'s opp. br. at 27). The plaintiff did not present evidence at trial with respect to that position and therefore failed to carry its burden of proof. *See Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1383 (Fed. Cir. 2007) (affirming summary judgment of non-infringement under the doctrine of equivalents on ground that the plaintiff failed to present evidence linking the accused product to the patent on a limitation by limitation basis). Counsel's arguments about equivalence are not supported by the evidence. A plaintiff cannot satisfy its burden with respect to equivalence merely by showing that the accused system achieves the same overall result as the claimed system.

Martin argues that the plaintiff's evidence of infringement was insufficient for the additional reason that no evidence was presented showing that Martin provided a conveyer system for any of the accused installations. The plaintiff's response to this argument goes to the

question of whether the plaintiff's evidence was sufficient to establish contributory infringement and/or inducement. As set forth above, the plaintiff's evidence was insufficient to show that each accused installation has a chute member as defined in the '171 Patent, and therefore the plaintiff failed to prove direct infringement by Martin or its customers. The plaintiff's claims of inducement and contributory infringement fail because proof of direct infringement is a predicate to a claim of indirect infringement.

In sum, judgment as a matter of law will enter in favor of Martin because under the controlling law, the evidence does not support a finding of direct infringement, either literal or under the doctrine of equivalents. The determination that the plaintiff 's evidence was insufficient to prove infringement renders moot the need for further proceedings on the issue of whether the patent is unenforceable due to inequitable conduct.

Based on the foregoing, it is

ORDERED that defendant Martin Engineering Company's Rule 50(b) Renewed Motion for Judgment as a Matter of Law is granted. The jury's verdict and award of damages to the plaintiff is vacated. The defendant is awarded costs under Rule 54 as the prevailing party. The clerk will enter judgment accordingly.

Dated: September 17, 2008

BY THE COURT:

s/ Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge